UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>    v.<br><br>MARK L. BAUSCH,<br><br>                    Defendant. | Case No. 2:14-cr-00399-KJD-GWF<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Dismiss – Dkt. #150) |

Before the court is Defendant Mark L. Bausch's ("Bausch") Motion to Dismiss for Violation of Immunity Agreement (Dkt. #150) which was filed under seal, which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4. The court has considered the motion, the United States' Response (Dkt. #163), Bausch's Reply (Dkt. #164), and the evidence introduced at an evidentiary hearings conducted March 22, 2016, and April 1, 2016. Dan Scheiss appeared on behalf of the government. Craig Drummond appeared on behalf of Mr. Bausch. The court has also considered the parties' supplemental papers filed after the hearing (Dkt. ##251, 252).[1]

/ / /

/ / /

---

[1] The court recused itself from participating in this case prospectively while this motion was under submission and before this report and recommendation was finalized. The recusal was based on an order entered by Chief Judge Gloria Navarro appointing Paola Armeni, counsel for co-Defendant Rachel Glaser, to the panel considering the undersigned's reappointment. The Judicial Committee on Code of Conduct Advisory Opinion No. 97 advises that "during the period of time that the panel is evaluating the incumbent and considering what recommendation to make concerning reappointment, a perception would be created in reasonable minds that the magistrate judge's ability to carry out judicial responsibilities with impartiality is impaired in a case involving an attorney or a party who is a member of the panel." The opinion states that recusal is not required for all members of the attorney's firm, only the attorney appointed to the panel. The undersigned knows of no circumstance which would require recusal as to any other Defendant involved in this case. However, because a case may only be assigned to one magistrate judge, I recused from the case.

**I.**     **The Indictment.**

Bausch, also known as Mark Eting, is charged in an indictment returned December 17, 2014, with one count of conspiracy in violation of 18 U.S.C. § 1349, thirty counts of wire fraud in violation of 18 U.S.C. § 1343, and five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and aiding and abetting.  The indictment arises out of allegations that Bausch and his co-Defendants operated a telemarketing scheme by offering help to small business owners to obtain and attempt to obtain grants from public and private entities.  The indictment alleges that the Defendants charged a fee for their services and induced business owners to pay their fees, knowingly made materially false and fraudulent representations and promises, and used the proceeds from the scheme to enrich themselves.  The telemarketing scheme is alleged to have occurred from 2007, to 2010.  The government alleges the Defendants organized and operated Small Business Funding Co., Inc., Company Funds, Inc., Foundation Research, Inc., and Silver State Holding Company to operate their telemarketing scheme.

**II.**     **The Motion to Dismiss.**

In the current motion, Bausch seeks to dismiss the indictment against him alleging the government violated an immunity agreement Bausch reached with Special Agent Jerald Burkin ("SA Burkin").  Bausch alleges that between 2010, and 2014, he was involved in a telemarketing model that was under investigation by federal authorities.  In October 2010, SA Burkin called Bausch into his office following execution of a search warrant at one of Bausch's businesses.  During the interview, Bausch told SA Burkin that he knew everyone involved in telemarketing scammer companies and would be happy to provide information and leads to assist the FBI.  According to Bausch, a few days after his initial interview, SA Burkin telephoned him requesting leads and telling Bausch he could get a letter of immunity from his boss with the United States Attorney's Office.  Bausch cooperated and sent information and leads to the FBI regarding 50 companies and scammers that resulted in about 10 different raids and over 25 criminal indictments.  In addition to receiving promises of immunity, Bausch claims he was also promised "comp-pay" on the assets seized.

/ / /

The motion claims that in 2012, Bausch requested a letter confirming his immunity. SA Burkin told Bausch that he needed to hire an attorney and have an attorney arrange to get formal immunity, but assured Bausch that he had immunity for his considerable cooperation. Bausch contends that SA Burkin informed him that he would not be charged with any crimes and would receive a proffer letter as long as he continued working with SA Burkin in getting him leads. SA Burkin also assured Bausch that the information he provided would be sealed and private to protect him from the people being investigated. On October 13, 2013, Bausch received a "death threat" from an individual for whom he had provided information to the FBI. The individual told Bausch that SA Burkin claimed that Bausch had "snitched him out." Bausch contacted SA Burkin who told him to come in and speak with "confidential informant specialist" Elizabeth Killcommon to discuss the threat. Bausch arrived at the local FBI office and met SA Burkin in the hallway. However, SA Burkin told him not to bring up his immunity deal with Killcommon because SA Burkin would get in trouble with his boss if their "deal" was brought up.

Bausch also believes he is entitled to approximately $8 million in "comp-pay" based on the government's seizure of over $11 million in cash and $30 million in property from Jariv as a result of leads and information he provided.

The government opposes the motion disputing that Bausch was given any form of immunity either verbal or written. The United States asserts that Bausch has the burden of pleading and persuading the trier of fact of the existence of an immunity agreement applying ordinary contract principles. Bausch did not support his motion with a sworn affidavit about what he would say under oath, and the motion should be summarily denied. Additionally, the government argues that the exhibits attached to the motion belie Bausch's suggestion that any type of immunity was given. The documents submitted in support of the motion show that as late as December 2014, Bausch planned to fight any charges against him, not because he was promised immunity, but because he claimed he was not guilty. The government claims that Bausch provided the FBI with unsolicited information about other individuals and did not accept responsibility for his own criminal conduct. Finally, the government argues that Bausch's belief, even if honestly held, that he would be granted immunity does not confer immunity upon him.

3

Relying on *United States v. Wilson*, 392 F.3d 1055, 1059 (9th Cir. 2004) the United States argues that a defendant's subjective belief that he would get immunity for providing information is insufficient.  Additionally, a "defendant expressing concerns about cooperating and asking for immunity does not grant immunity to a defendant."  To the contrary, it reflects a defendant's knowledge that there was no grant of immunity.

Bausch replies that the government's reliance upon *United States v. Helmandollar*, 852 F.2d 498 (9th Cir. 1988) is inapposite.  *Helmandollar* involved a plea agreement rather than an immunity agreement.  Immunity agreements implicate the due process clause and involve grave concerns of public policy, which would militate against placing the burden on the defendant to establish the existence of an immunity agreement.  As such, the burden should be on the government, not the defendant to establish the existence of an immunity agreement.  The Ninth Circuit recently held in *United States v. Mark*, 795 F.3d 1102 (9th Cir. 2015) that it is the government's burden to establish a breach of an immunity agreement.  However, even if Bausch bears the initial burden of establishing the existence of an immunity agreement, he maintains that his motion satisfied that burden.  In contrast, the government has provided only a bare *ipse dixit* that no agreement was reached.  Bausch claims that the *Wilson* case relied upon by the United States is easily distinguishable because the language the defendant relied on to support the existence of an immunity agreement in that case did "not objectively reflect words of offer."  In this case, there is no indication that SA Burkin lacked the authority to grant Bausch immunity, or that he ever actually communicated that fact to Bausch.

Bausch requested an evidentiary hearing to determine the terms and scope of the immunity agreement.  Bausch also requested that the government produce all cell phone and email records for FBI SA Burkin from January 2009, to the present regarding communications with Bausch.

The court granted multiple requests by Bausch for subpoenas duces tecum to obtain cell phone and email records from Bausch's internet and cell phone providers.  The evidentiary hearing in this case was set and rescheduled multiple times at the request of counsel for Bausch to investigate and to obtain documents and information to support his claims.  Multiple status

conferences were held to schedule an evidentiary hearing which was continued multiple times at the parties' request.  An evidentiary hearing was finally begun on March 22, 2016.

### III.   The Evidentiary Hearing.

At the evidentiary hearing Bausch called SA Burkin and SA Killcommon, and testified on his own behalf.  The government called SA Gene Tierney. At the conclusion of the first day of the evidentiary hearing, Bausch requested an opportunity to subpoena and call attorney Michael Van.  The evidentiary hearing was continued until April 1, 2016, for this purpose.

#### A.  Testimony of Special Agent Burkin.

SA Burkin is assigned to the FBI's Las Vegas field office and has been employed by the FBI for eight years.  He was involved in the investigation resulting in the indictment in this case beginning in 2008 or 2009.  During the course of his investigation he had a number of contacts with Bausch beginning in approximately October 2010.  This contact was initiated after a search warrant was executed at one of Bausch's companies.  Bausch initiated a call with the FBI a few days after the search warrant was executed and came into the FBI office where he was interviewed by SA Burkin and his partner, Gene Tierney.  The interview was memorialized in an FBI 302, which was a part of a series of documents marked and admitted as Defendant's Exhibit 1.  In the October 26, 2010 302, Bausch, who used the name Mark Eting, stated that he had retained the law firm of Mills & Mills LLC as his attorney, but that they were unwilling to represent him in the criminal case, but were willing to work with Eting in the interim until he was able to retain a criminal attorney.

Counsel for Bausch went through a series of email communications Bausch sent to SA Burkin.  In a November 23, 2010 email, Bausch provided his new cell phone number.  SA Burkin testified that he attempted to call Bausch because Bausch had sent an email requesting tax records so that he could prepare his tax returns.  These records had been seized during the execution of the search warrant at Bausch's business.  In a December 25, 2010 email, Bausch wished SA Burkin Merry Christmas and again mentioned the need for his tax records to prepare his tax return.  In email exchanges on February 1, 2011, Bausch indicated he would send his CPA in to pick up the tax records because he did not trust "u guys." SA Burkin responded that

he was sorry Bausch felt that way, but to let Bausch know when the CPA would be in so the records could be made available.  Later the same day, SA Burkin sent an email to Bausch indicating he would still like to talk to him about scammer companies and get his thoughts.  The email stated that if Bausch was willing to talk, to let him know.

Bausch sent an email to SA Burkin on May 30, 2011, which SA Burkin forwarded to SA Gene Tierney.  SAs Burkin and Tierney worked together on the same squad.  SA Burkin forwarded Bausch's email because he was providing information about other scammer companies.  SA Burkin was asked if he was aware Bausch was deleting correspondence with SA Burkin.  SA Burkin responded that Bausch had sent him an email saying he had saved all of their communications.

In a July 30, 2011 email from Bausch to SA Burkin, Bausch stated "you lied to me" and Bausch was going to "activate the retainer" he gave David Chesnoff "the biggest Criminal Defense Lawyer in Las Vegas!"  SA Burkin testified he did not know why Bausch was claiming that he had been lied to.  However, he acknowledged that this email followed a July 29, 2011 interview of Bausch at the FBI offices.  The interview was memorialized in an FBI 302 which was part of the documents marked and admitted as Defendant's Exhibit 1.  In the interview with SAs Burkin and Tierney, Bausch said he was still willing to provide assistance to the FBI, but only if he received a letter of immunity.  The 302 was not a verbatim account of the interview.

Two days later on August 1, 2011, Bausch sent an email to SA Burkin indicating he had two really good leads for him.  SA Burkin did not recall any telephone conversations with Bausch between July 29 and July 30, 2011.

An August 15, 2011 302 memorializes a telephone call with Bausch on the same day.  In it, Bausch expressed his continued willingness to help the FBI.  The 302 states that SA Burkin explained to Bausch that his assistance would need to be coordinated through an attorney based on Bausch's previous emails that stated he was going to hire an attorney.  Bausch had gone back and forth about whether he was going to hire an attorney.

Bausch sent SA Burkin an email on October 27, 2013, requesting that SA Burkin send him a detailed list of what information SA Burkin wanted to talk about so that he could bring in

6

his paperwork.  The email contained additional information about scammers.  Bausch also claimed that he had received a threat and believed that the FBI had leaked information about Bausch's cooperation.  SA Burkin communicated with now-retired SA Beasley who suggested that Bausch come in and meet with the FBI, SA Killcommon, and the Secret Service special agents who were working on the investigation involving those individuals.  SA Burkin set up a meeting between Bausch and SA Killcommon, but did not recall if he met Bausch first when Bausch arrived at the FBI office.  SA Burkin believed that the meeting was to discuss the threat Bausch claimed he received and because the individuals involved in the threat were involved in SA Killcommon's investigation.

Between 2010, and 2013, Bausch sent a lot of emails and communicated information about grant entities.  However, SA Burkin denied that the FBI was able to use his information.  To SA Burkin's knowledge, none of Bausch's information was used to obtain search warrants or was helpful in SA Burkin's investigation.

In a November 1, 2013 email Bausch sent to SA Burkin, he thanked SA Burkin for setting up the interview with SA Killcommon.  In it he states that Killcommon did not want "to talk about our deal.  Mine and your deal Jerald.  Me and you have only a handshake deal.  And I do trust you Jerald, but we do have a problem."  SA Burkin testified that he did not know what Bausch meant by a handshake deal.  When asked directly if SA Burkin and Bausch had a handshake deal, he responded "absolutely not."  SA Burkin knew of no FBI email telling Bausch that he had no immunity deal.  When asked why he did not clarify or respond to Bausch's email about their handshake deal, SA Burkin responded that if Bausch wanted to keep providing information, he was not going to say no.  SA Burkin would not have saved all email communications from Bausch unless he believed they were pertinent to his investigation.

SA Burkin requested FBI internal desk call records from April 2010, to September 30, 2015, from FBI internal numbers to three phone numbers associated with Bausch.  A search was done and located five calls between November 2, 2010, and November 9, 2010.  All of the calls were incoming and of short duration.  SA Burkin reviewed defense Exhibit A of Verizon phone

1   records with an attached Excel spreadsheet.  After SA Burkin learned Verizon records reflected

2   more cell phone calls from Bausch to the FBI, he talked with AUSA Griswold.

3        Counsel for Bausch reviewed the contents of Tab 3 of Defendant's Exhibit 1 which

4   consists of Google records.  There are some additional Google emails reflecting exchanges

5   between Bausch and SA Burkin that he did not previously have.  These are emails which SA

6   Burkin may have deleted because he believed they were not pertinent.  SA Burkin testified that

7   FBI mail boxes only have a 200 megabyte capacity, and emails are deleted.  Burkin kept paper

8   copies of some emails and produced the ones he considered substantive.  He did not preserve

9   non-substantive email communications with Bausch.

10       Between 2010, and 2014, Bausch did not have an immunity deal.  SA Burkin did not

11  consider Bausch a confidential informant or a confidential human source, the current title for

12  what used to be referred to as a CI.  SOI (source of information) is a term that is still used, but

13  not a term that SA Burkin uses.

14       SA Burkin was asked about the FBI policy on comp pay.  SA Burkin testified that he has

15  never been involved in a case personally involving comp pay.  SA Burkin was not involved

16  directly or indirectly in the investigation involving Mr. Villegas.  Bausch's information may

17  have helped on the search warrant in that case.  SA Burkin acknowledged that Bausch provided

18  information on a number of individuals SA Burkin was investigating who were identified on the

19  record.

20       SA Burkin did not recall telling Bausch that he had a conversation about Bausch with

21  AUSA Christina Brown.  Christina Brown was the prosecuting attorney involved in his

22  investigation and SA Burkin kept her updated.  SA Burkin did not recall if he discussed the fact

23  that Bausch had asked for immunity with Brown.  However, Brown would have seen the 302 in

24  which Bausch mentioned it.

25       SA Burkin reiterated that he did not offer Bausch anything in return for his information.

26  However, SA Burkin and his partner would have discussed Bausch's information and request for

27  immunity.  No document mentioning an offer of immunity exists because immunity was never

28  offered.

On cross-examination, SA Burkin testified that he never told Bausch he had immunity. Bausch requested immunity a number of times in writing and in conversations.  The first time Bausch mentioned immunity was in the first face-to-face interview with Bausch on July 29, 2011, which was documented in a 302.  Bausch brought up the subject of immunity towards the end of the interview.  The 302 documents that Bausch stated he would "kill himself" before going to jail, would "plead the Fifth on everything," and that he was willing to provide information on other grant funding companies, but only if he was provided a letter of immunity. SA Burkin did not recall his exact words in response, but testified he told Bausch, in substance, not to hurt himself.  Burkin also told Bausch that he was not authorized to grant immunity and that the attorneys decide who gets charged and who doesn't.  Bausch mentioned he wanted to be paid for his information and SA Burkin responded that they would have to "resolve his situation" regarding any charges before anything could be offered.

SA Burkin testified that Bausch raised the issue about immunity on subsequent occasions.  SA Burkin responded to very few of Bausch's emails.  Counsel for the government exhaustively went through the series of email communications between Bausch and SA Burkin which were marked and admitted as Government's Exhibit 1.  SA Burkin testified that he started to question Bausch's mental state and credibility.  SA Burkin formed the opinion from many of Bausch's communications "that he'd watched too many movies."  At one time, Bausch communicated in an email that he would not mind if he was arrested and placed on probation. Bausch continued to provide unsolicited information to SA Burkin.  In a November 1, 2013 email, Bausch stated he had every email that he had ever sent to SA Burkin.  In an August 30, 2011 email, Bausch asked if SA Burkin would like him to take a lie detector test.  The email also indicated that Bausch knew a place where 5000 lbs. of methamphetamine and a few million in cash were located, and asked if he should give the information to SA Burkin or the DEA.  SA Burkin did not respond to the email because he did not believe the information was credible at all.

In a November 17, 2012 email, Bausch asked SA Burkin if he could get paid back for asset forfeiture.  The email indicates Bausch believed he had been responsible for the asset

seizure and was asking if he got a cut of the monies collected.  In an October 2, 2013 email, Bausch refers to a "comp plan" on assets.  SA Burkin testified he did not know what a comp plan was.  However, he believed the email was a request for money related to asset forfeitures.  With respect to whether Bausch was ever offered compensation for his willingness to work with the FBI, SA Burkin told Bausch that first and foremost, we "need to figure out your situation."  SA Burkin acknowledged that he told Bausch that if his "situation was figured out" there was a possibility Bausch could be paid for information sometime in the future.

SA Burkin reiterated that he had no clue what Bausch meant in the November 1, 2013 email the day after he was interviewed by SA Killcommon and Secret Service special agents about "a handshake deal" between the two of them.  In the same email Bausch claimed that he had cooperated with the IRS and a number of other state and federal agencies.  SA Burkin checked his claims out and found that Bausch had not cooperated as he had claimed.  By this time, SA Burkin had begun to question Bausch's mental condition and credibility.  The November 1, 2013 email talks about not having helicopters, tanks and machine guns come to his home.  The email states that Bausch could not sign a deal that barred him from the grant industry, but that he would sign anything else and help testify.  Bausch ends the email by stating he wanted something in writing before he sent more detailed lead information.  Specifically, he wanted full immunity, he agreed he would testify against anyone, and sign anything, tell anything Burkin wanted about the companies he was involved in.  Bausch also asked if he could be made an undercover agent and put in call centers.  The email states that he would "fit in" for various reasons and because he smoked weed every day.  He wanted a badge and a gun.  Bausch also sent an email suggesting that agents get him a Benz so that he looked like he had a lot of money.  The email ended with "come on man, let's have some fun with this!"

On December 2, 2014, Bausch sent an email indicating that he was aware of a grand jury hearing and wanted a meeting away from the FBI office.  SA Burkin testified that he would not have responded to this email, and that for the most part, SA Burkin ignored Bausch's email communications.

/ / /

1    SA Burkin received an email from Bausch on January 4, 2015, after Bausch was arrested
2    and indicted.  In this email, Bausch states that he is really disappointed in how the arrest was
3    executed.  Bausch claims that he had worked as a confidential informant for years and had
4    cooperated in good faith with "nothing in writing."  The email also states that Bausch was under
5    the impression that he would not be charged based on his assistance and cooperation.

6    On Friday before he testified, Burkin found out from AUSA Schiess that counsel for
7    Bausch had an email that was not in the government's discovery production.  SA Burkin
8    believed that this may have been an email that he had deleted.  SA Burkin made a request
9    through FBI headquarters to determine if they could recover any deleted emails and was told
10   deleted emails could not be recovered from the archives.  SA Burkin reiterated that he may have
11   deleted emails he regarded as insignificant from Bausch.

12   **B.  Testimony of Special Agent Elizabeth Killcommon**

13   Special Agent Killcommon ("SA Killcommon") is employed by the FBI, and currently
14   assigned to the FBI Boston field office.  She worked in the Las Vegas field office between
15   August 2009, and May 2014, investigating grant funding entities.  At that time, the squad had
16   multiple grant funding investigations, some of them were overlapping and special agents would
17   exchange information if one squad's information related to another squad's case.  She met with
18   Bausch on one occasion.  Her squad mate Jerald Burkin related that Bausch may have
19   information related to her investigation of multiple entities including Business Acumen and
20   several other individuals including Greg Villegas.  The Secret Service was also involved in this
21   investigation.  She may have spoken with Jerald Burkin and Gene Tierney about Bausch, but did
22   not recall.  She did not know Bausch's status with the FBI, or whether he was a source of
23   information.

24   She was familiar with Bausch's name, and thought he had information about grant
25   funding business in Las Vegas.  SAs Burkin and Tierney told SA Killcommon that Bausch may
26   have some information.  She did not read Bausch his rights or handcuff him during the interview.
27   During the interview, Bausch discussed Greg Villegas and target companies associated with
28   Villegas.  Burkin concluded that Bausch's information "wasn't actionable."  By this, she meant

11

his information was too general or generic and not specific enough to be used.  She learned nothing new from Bausch.  The interview was recorded in a 302.

During the interview with Bausch, she did not discuss an alleged death threat that Bausch claimed to have received.  She did see the reference in an email that SA Burkin forwarded to her that Bausch claimed he had received a death threat.  Counsel for Bausch reviewed a number of emails with her about information Bausch supplied to the FBI.  SA Killcommon testified that Bausch's information was old information and did not lead to arrests.  At the time Bausch provided his information, the FBI had decided not to indict one of the targets, Chavez.  It was apparent that Bausch thought Villegas was indicted based on information Bausch provided.  However, SA Killcommon told Bausch that Villegas was indicted based on her investigation.  She wanted to be clear with Bausch that his information did not result in the indictments.

On cross-examination, SA Killcommon testified that she saw a November 1, 2013 email from Bausch to SA Burkin.  In it Bausch refers to her as a confidential informant specialist.  SA Killcommon testified she was never a confidential informant specialist and did not even know what that title was.

**C.  Testimony of Mark Eting, aka Bausch.**

Bausch testified that his first involvement with SA Burkin was in 2010.  The day after a search warrant was executed on his premises, Bausch was called by Joseph Dickey, the head of the FBI, and told to come to the FBI the next day to speak with Jerald Burkin.  The day after Bausch met with SAs Burkin and Tierney and answered a bunch of questions about his company.  SA Tierney stated that the grant industry was like a virus.  Jerald Burkin stated that there were a lot of companies scamming people.  Bausch told the agents he was happy that they had shut down a number of companies and that a lot of people were committing fraud.  Bausch also told the agents that he had a lot of information about a lot of people.  Gene Tierney did not want to work with Bausch and did not like him.  However, Jerald Burkin was a young guy and stated he needed to talk to his boss at the U.S. Attorney's Office.  Bausch told SA Burkin he needed a letter of immunity.  SA Burkin responded that Bausch should give him some stuff and SA Burkin would talk to his boss at the U.S. Attorney's Office.

1    As a result of this initial interview, Bausch sent SA Burkin snippets of information and a

2    lot of other stuff via email.  He also talked with Jerald Burkin on the phone.  He estimated that he

3    spoke with SA Burkin a couple of times per week, at least, for a period of time, and then a

4    couple of times per month, providing helpful information.  Defense Exhibit 1 consists of a series

5    of emails that were sent.  There are very few responses from SA Burkin.  However, Bausch

6    testified that SA Burkin responded to many of his emails.  Bausch testified that about six months

7    after his business was raided, and before Villegas was arrested, SA Burkin told Bausch "your

8    immunity has been approved."  This was in approximately March 2011.  SA Burkin told Bausch

9    he got the okay from his boss at the U.S. Attorney's Office.  The immunity was conditioned on

10   Bausch providing good information.  If Bausch did not provide good information he was

11   informed he could be indicted.  Bausch claims that every one of the people on whom he provided

12   information was raided and indicted.  Specifically, Greg Villegas and his gang, Michael Jones,

13   James Jariv, Craig Rudolph and his group, and a number of others were raided and/or indicted.

14   Between March 2011 and the time of his arrest, Bausch was never told that his immunity

15   deal was off.  When SA Burkin told him his immunity had been approved, Bausch asked that SA

16   Burkin put his boss on the phone to confirm.  SA Burkin said no.  Bausch then asked for SA

17   Burkin to confirm the immunity deal in an email.  SA Burkin agreed to do so, and sent an email

18   confirming he had spoken with the AUSA who had approved immunity conditioned upon

19   Bausch providing good information.  Bausch does not have SA Burkin's responsive emails over

20   the years, or the immunity email, because he deleted them.  A person who was working with

21   Bausch was also renting a room from him at the time.  The roommate worked at the company

22   and used Bausch's computer all of the time.  Bausch was concerned his roommate would find the

23   emails about working with the FBI, so he erased them all.  At the time he was a single father of

24   kids.  He was providing information about Greg Villegas that had been disclosed by the FBI in

25   discovery and was told that Villegas was going to kill him and he needed to watch his back.  This

26   was why he deleted Burkin's emails.

27   Bausch emailed Jerald Burkin in October 2013 about death threats he had received.  He

28   was told to come into the office and meet with Elizabeth Killcommon who was an informant

13

specialist.  Bausch understood Killcommon was Burkin's boss and that she dealt with threats and would address the threat from Villegas.  Bausch showed up at the FBI and spoke to Jerald Burkin first.  SA Burkin was kind of angry.  SA Burkin told Bausch that when he talked to Elizabeth not to mention anything about "our deal of immunity."

When Bausch met with Elizabeth Killcommon, he brought in a big box of documents.  He also made a list of all of the people he'd "given to the FBI."  Killcommon told Bausch "you didn't bust these people" and that it was her investigation that resulted in their arrest.  Bausch responded that that was not true, I don't believe you.

After meeting with Elizabeth Killcommon Bausch sent the November 1, 2015 emails to SA Burkin because he was concerned the entire time that he did not have a letter from the U.S. Attorney's Office.  Bausch did not trust SA Burkin after the meeting with Killcommon, but still continued to send him information "hoping my agreement would be honored."

Bausch asked SA Burkin for his tax records so he could prepare his tax returns.  Bausch went to the FBI office and SA Burkin "handed me off to Gene Tierney" who did not like Bausch.  Tierney handed Bausch a script and asked who wrote it.  Bausch said it was Nachi's organization.  Tierney then handed Bausch a plea agreement and said "here's the federal point system."  Tierney told Bausch that he knew that Jerald made a deal with Bausch for immunity but stated "we can't do that" and handed Bausch a deal to go to prison and pay $2 million dollars in restitution.  After this meeting with Tierney, Bausch called SA Burkin and told him he was a liar.

Bausch also testified that his deal with SA Burkin was to receive comp pay.  He understood comp pay was monetary compensation or pay for cooperating.

On cross-examination, Bausch testified that his legal name since 2009 is Eting.  In November 2009, he went into a mental hospital for 30 days and changed his name after that so it was not affiliated with companies he operated.  He was also hospitalized in a mental hospital in 2005 for three or four weeks.

SA Joe Dickey called Bausch the same day Bausch's company got raided.  Dickey told Bausch he needed to come into the office to talk to Jerald Burkin.  The next day he went to the

FBI office to meet with Jerald Burkin. Bausch testified that he did not come in the following day, so Joe Dickey called him. Dickey asked where Bausch was. Bausch responded that he was home playing games and smoking dope. He used marijuana for his bipolar condition and for his anal fissures after he stopped taking his bipolar medication. During this period he was "high all day." He has been diagnosed with bipolar since 2005 when he went in for treatment into the hospital.

When he did come into the FBI a couple of days later after his office was searched, Bausch offered to help the FBI, but stated he wanted a letter of immunity from the U.S. Attorney's Office. Gene Tierney didn't like it and was "mad dogging" Bausch the whole time. Jerald Burkin, however, told Bausch to send him some stuff, not everything, and a profile on Bausch's background. Bausch did not believe he had an agreement for immunity at the FBI after this first meeting.

Immunity was important to Bausch because he was involved in a company that got raided and thought he could be charged and go to prison. Bausch denied that he was scared about going to prison.

In March 2011, Jerald Burkin called Bausch and said that he had talked with his boss at the U.S. Attorney's Office and that she had approved Bausch's immunity. Bausch stated he wanted it in writing. SA Burkin refused saying "that's not how it works." Bausch asked SA Burkin to put his boss on the phone. SA Burkin responded no, that's not how it works, and that the agreement was a conditional agreement. Bausch acknowledged that he was concerned when SA Burkin said he would not put the immunity deal in writing.

Bausch testified that in March 2011, after SA Burkin confirmed he had immunity, Bausch did not call his prior lawyers Mills & Mills or David Chesnoff. He did not call a lawyer to confirm his immunity because he did not have any money to retain them. He had earlier paid Mills & Mills a $5,000 retainer, but after his company was raided, the firm did not want to have anything to do with him and told him they were no longer his lawyer.

Bausch never paid David Chesnoff a retainer. A friend told Bausch they could go to Chesnoff's office, Chesnoff owed the friend a retainer, and Chesnoff would work for Bausch

15

based on the friend's retainer.  However, this did not work out.  Bausch acknowledged that he did tell Jerald Burkin he paid Chesnoff a retainer and that this was not truthful.  Bausch's friend told Bausch that Chesnoff owed the friend something.

In March 2011, Bausch received an email from SA Burkin confirming he had been approved for immunity.  Bausch wasn't sure if the email was valid.  Bausch asked Burkin for an immunity agreement in writing.  SA Burkin told Bausch to get an attorney.  Bausch agreed that the email confirming his immunity had been approved was a very important email.  Because it was very important, Bausch printed it and placed the hard copy in a folder in a box in his garage.  However, he does not have the email because he got evicted from the house.  All of the emails he was hiding from his roommate were lost when he was evicted because he was not able to get the boxes he was storing in his garage.  He had to delete the emails from SA Burkin because he was afraid his roommate would see that he was working for the FBI.

The March 2011 email from SA Burkin was the best thing he had in writing confirming his agreement.  At the time he received the email from SA Burkin, Bausch had an email account with Google.  The account required a user name and password to sign on, and the computer was password protected.  However, Bausch testified that he was "stoned all of the time" and was afraid that his roommate, Paul DeLaney, would find the email, so he deleted it almost immediately.

After March 2011, he continued to send information to Jerald Burkin, and gave him a lot of good information.  On December 17, 2014, Bausch was indicted and arrested and made a court appearance.  He was detained in a halfway house for a number of months and then released on GPS monitoring.  He continued to send emails to SA Burkin from the halfway house and also made a few phone calls from his cell phone to SA Burkin from the halfway house.  Bausch's lawyer told him to stop sending emails to Jerald Burkin.  The lawyer was mad at Bausch and told him never to do that again.

In approximately mid-2012, Jerald Burkin also said he would give Bausch immunity in writing.  Burkin told Bausch to get an attorney.  A friend of Bausch told Bausch to see the friend's lawyer, Mike Van.  Bausch went to Mike Van who called SA Burkin on the phone.  Van

and SA Burkin talked for approximately 40 minutes.  Van offered to do a letter, but indicated it would cost Bausch $5,000.  Bausch told Van that his friend, John Kerry would pay for it.  Van called the friend who would not pay for Bausch's attorney's fees.  Van told Bausch that he had a verbal agreement for immunity, but needed to put it in writing.  Van told Bausch to come back when he had the money to put it in writing.  Bausch relied on SA Burkin's word, but never had the money to hire a lawyer to put it in writing.

Counsel for the government reviewed Bausch's affidavit supporting the motion to dismiss.  Bausch testified that his lawyer prepared it and that he signed it.  However, he agreed that everything in the affidavit was true.  Bausch acknowledged that nowhere in the affidavit does it say that Bausch got a March 2011 email from SA Burkin confirming that his request for immunity was granted.  He skimmed the motion to dismiss his lawyer filed.  He felt strongly that he had worked for the FBI for several years and then sent them leads.  He felt so strongly about his cooperation that he asked the FBI for a job.

In his November 1, 2013 email following his meeting with Elizabeth Killcommon, he believed he was not going to get a letter of immunity because he did not have the money for a lawyer.  In the email he was bluffing, and intentionally made a false statement that he wanted to hire David Chesnoff because he wanted to make SA Burkin tell the truth.  Bausch's email stated he had all of their email exchanges because he wanted SA Burkin to believe that he had the evidence to confirm he had full immunity.  Bausch acknowledged that he had not mentioned Van's name in any email.

On July 29, 2011, Bausch came into the FBI office to get his tax records.  SA Burkin handed Bausch off to Tierney who tried to trick him to sign a deal.  Tierney told Bausch that he knew Jerald had promised him immunity, but that it couldn't be given to him.  Tierney gave Bausch a plea agreement that called for 24 months in prison and $2 million in restitution.  It was a plea deal through the state or local District Attorney's Office.  Bausch told Tierney that he had an agreement with Jerald Burkin.  The plea agreement he was handed looked like a tri-fold form with a white sheet, a pink sheet and a yellow sheet.  Bausch thought it was odd.  Tierney told Bausch that he was SA Burkin's boss, and this was the best deal he could get Bausch through the

D.A.   Bausch  could  not  recall  what  the  plea  agreement  said  concerning  the  charge  he  was supposed to plead to, or a statement of facts.  Bausch did not read it, but saw there was a spot for the D.A. to sign.  Tierney gave Bausch a pen to sign it.  Bausch responded, "you are out of your mind if you think I'll sign it.  I have an immunity agreement with Jerald Burkin."

Tierney responded that this was the best deal that he could get Bausch from the D.A., and that Bausch could do the time standing on his head.  Bausch was angry and said he'd kill himself.  Bausch left before he got his tax records.  The meeting with Tierney occurred in the FBI building.  Tierney asked 3-5 minutes worth of questions regarding a telemarketing script, and then showed Bausch the plea agreement.  Bausch got mad and walked out.

Bausch stated that the 302 regarding the July 29, 2011 information contained false and fabricated information.  He characterized the 302 as "all BS."  Bausch denied that he provided the information contained in paragraphs 2 and 3 of the 302 to the FBI on that date.  Bausch did not believe that the date on the 302 was accurate.  However, he acknowledged that on July 30, 2011, the next day, he told Jerald Burkin in an email that SA Burkin lied to Bausch.  The July 30, 2011 email says nothing about the plea agreement Tierney presented to Bausch.  The email does say that Bausch no longer trusted Burkin.  At this time, Bausch believed SA Burkin was trying to trick him into giving a confession.

On December 2, 2014, Bausch sent Burkin an email stating that he was aware the FBI was running a grand jury investigation on Silver State.  The email states that Bausch was "sticking to my guns" and planned to fight this out as long as it took.  The email does not say that SA Burkin promised Bausch immunity.  It does not refer to the email confirmation of immunity.

January 4, 2015 is the next email that Bausch sent Burkin.  The email states that Bausch was under the impression he would not be charged.  This email also does not mention the March 2011 email confirming an immunity deal.  It does not mention SA Burkin speaking to Mike Van about an immunity deal.

On re-direct, Bausch acknowledged that his November 1, 2013 email to SA Burkin stated that Bausch had every email Bausch sent SA Burkin.  Bausch did print out the emails even though he erased them from his computer and placed them in a folder.  However, he lost all of

18

1    these emails when he got evicted and no longer has a physical file.  He attempted to obtain

2    emails from Google, but was told that Google could not retrieve the emails that had been deleted

3    that long ago.

4          **D.  Testimony of Gene Tierney.**

5          The government called Special Agent Gene Tierney in rebuttal.  Tierney testified he met

6    with SA Burkin and Bausch on July 29, 2011.  Tierney denied that he ever presented Bausch

7    with a plea agreement providing Bausch would serve 24 months in prison and pay $2 million in

8    restitution.  Tierney testified that he was a federal agent and does not offer plea agreements on

9    behalf of the District Attorney's Office.

10         On cross-examination from counsel for Bausch, Tierney testified that he did not recall if

11   SA Burkin stepped out of the room at any point during the July 29, 2011 interview.  He would

12   normally note in a 302 who was present during an interview.

13         **E.  Testimony of Michael Van.**

14         Mr. Van is an attorney who practiced in Las Vegas between 2010, and 2012.  He recalled

15   speaking on the phone with Mr. Drummond, counsel for Bausch about Bausch, but could not

16   recall exactly when.  He had a second conversation with Mr. Drummond approximately a week

17   prior to his testimony in which he was informed he would be a witness.  Van also spoke with

18   AUSA Schiess and someone else, he did not recall whom.  Van did not review any documents or

19   FBI 302s to prepare for his testimony.

20         Van first met SA Burkin at the hearing.  However, he had a conversation with SA Burkin

21   some time ago regarding another matter.  Before court he talked with SA Burkin about the client

22   the NCAA bracket.  Van knows who Bausch is.  He did not recall when he first met Bausch,

23   possibly in 2011.  He knew it was more than two years ago.  Van discussed Bausch's criminal

24   case.  Bausch began to tell Van very generally what was going on.  Van could not recall the

25   specifics of their conversation.  Van did recall that there was a discussion about a proffer letter.

26   Bausch came to Van because of a relationship with a client of Van's.  Bausch said he was

27   working with the FBI and was willing to cooperate.  Van told Bausch that Bausch should be sure

28   to get a proffer letter.  There were discussions regarding what a proffer letter was.  Van could not

recall that the word immunity was ever mentioned.  SA Burkin's name came up.  Van told Bausch that he was familiar with SA Burkin.  Van called SA Burkin while Bausch was in the office.  Van discussed Bausch with SA Burkin in general terms.  However, Van disputed that he discussed a proffer letter with SA Burkin in the telephone conversation.  Van's recollection of the conversation was he told SA Burkin that Bausch was in his office.  He told SA Burkin that Bausch would like to cooperate and asked if SA Burkin was interested.  SA Burkin responded that it depended on the information that Bausch had.

After the conversation with SA Burkin, Van asked Bausch if he wanted to retain him.  Bausch said that Van's other client was willing to pay.  Van called the other client and was told that the client would not pay for Bausch's fees.  Van told Bausch he needed to work something out.  Van characterized his conversation with SA Burkin like "buying a car" and "kicking the tires" to see if there was any value in handling the case.  Van told Bausch he needed to hire Van to see if they could get a proffer, and said he needed a retainer.  Van could not recall the retainer he quoted.  Bausch did not have the money and left.

On cross-examination, Van testified that the conversation with SA Burkin lasted approximately 2-3 minutes.  The majority of the conversation was about Van's other client.  They discussed Bausch for 15-30 seconds.  The word "immunity" never arose.  SA Burkin was friendly, cordial, but very non-committal.  SA Burkin did not say that he was promising anything, but was incredibly non-committal.

Van testified that he understands that a proffer letter is an agreement that says "if you help us, we'll take your information, and unless we find you're lying, we may agree at a later date to assist in sentencing."  It is his understanding that a proffer is not a grant of immunity.  Bausch was in Van's office when Van called SA Burkin to discuss another client's case.  Van talked only about the status of a pleading in the other case.  His purpose in discussing Bausch was to determine the magnitude of what was going on so that he could decide on an appropriate retainer to charge Bausch.

In response to a question from the court, Van testified that during his meeting with Bausch, Bausch did not say he believed he had immunity.

**DISCUSSION**

I.     **Legal Standards.**

    **A.  Immunity Agreements.**

        Bausch does not claim that the government offered formal statutory immunity under 18 U.S.C. § 6003.  Statutory immunity requires the approval of an Assistant, or Deputy Assistant, Attorney General, and an order compelling testimony from the district court.  *See* 18 U.S.C. § 6003.  Statutory immunity is usually given when a defendant asserts the Fifth Amendment privilege against self-incrimination and refuses to testify before a court or grand jury.  *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir. 1991).  Rather, Bausch claims that he and SA Burkin entered into an oral informal agreement, which was eventually memorialized in a March 2011 email from Bausch to SA Burkin.

        Informal immunity may be granted in varying degrees and in a variety of circumstances.  *Id.* An informal immunity agreement may be granted when a defendant offers to supply information in exchange for money, protection and immunity.  *Id.* (citing *United States v. Irvine*, 756 F.2d 708, 709 (9th Cir. 1985)).  An informal immunity agreement may also be created when the government offers immunity from prosecution if an arrestee cooperates in an investigation.  *Id.* (citing *United States v. Carrillo*, 709 F.2d 35 (9th Cir. 1983)).  The government is not required to follow the procedures for statutory immunity under 18 U.S.C. § 6003 to confer informal immunity "and ordinary contract principles apply when interpreting informal immunity agreements."  *Id.*  In *Carrillo,* the Ninth Circuit held that a cooperation agreement is analogous to a plea bargain agreement, and "an agreement to cooperate may be analyzed in terms of contract law standards."  709 F.2d at 36.

        Bausch argues that the burden of establishing the non-existence of an immunity agreement should be on the government because immunity agreements implicate his due process rights.  However, the Ninth Circuit has rejected this view and has held that the party claiming the existence of an agreement with the government has the burden of pleading and persuading the trier of fact of the existence of the agreement.  *United States v. Helmandollar*, 852 F.2d 498, 502 (9th Cir. 1988).  *Helmandollar* was a case involving a plea agreement.  However, in *Plummer*

and *Carrillo* the Ninth Circuit has clearly held that the same principles apply to cooperation and immunity agreements.  In *United States v. Wilson,* 392 F.3d 1055, 1059 (9th Cir. 2004) the Ninth Circuit explicitly stated that ordinary contract principles apply in determining whether the government has granted immunity.  The trial court's factual determinations are reviewed for clear error.  *Id.*  The trial court's determination relating to formation of an enforceable agreement is also reviewed for clear error.  *Id.*  Applying ordinary contract principles requires the court to determine matters regarding offer, rejection, and revocation, utilizing objective contract standards.  *Id.*  These determinations are upheld unless clearly erroneous.  *Id.*

Applying ordinary contract principles, the trial court determines whether a contract was formed, whether the facts establish a violation of the contract, the reasonable interpretation of the agreement in light of the contract as a whole and the surrounding circumstances.  *United States v. Plummer*, at 803.  If both parties' interpretation of a contract is reasonable after all the evidence is heard, any ambiguity is resolved against the party who drafted the language.  *Id.* at 804.  However, the rule construing contracts against the drafter "is not an alternative to construing the contract as the parties intended.  It is to be applied after the court has inquired into the intent of the parties, and then only if its meaning remains uncertain."  *Id.* (internal citations and quotations omitted).  If an agreement is ambiguous, the trial court determines "what obligations the agreement imposed upon the government."  *United States v. Anderson*, 970 F.2d 602, 607 (9th Cir. 1992).  In making the factual determination of what the parties agreed to in an agreement, the court "should resolve the issue by objective standards."  *Id.*  The government must be held to the literal terms of the agreement, and "ordinarily must bear responsibility for any lack of clarity."  *Id.*  However, the dispositive question is what the parties to the agreement reasonably understood to be the terms of the agreement.  *Id.* (internal citations and quotations omitted).

A defendant's subjective belief that he would be granted immunity is insufficient. *Wilson,* 392 U.S. at 1060.  Rather, the court examines whether or not the statements used by a government official objectively reflect words of offer.  *Id.*  In *Wilson*, the Ninth Circuit relied upon the provisions of the Restatement (Second) of Contracts § 24 (1981) to determine whether an offer was extended.  Under the Restatement (Second) "An offer is the manifestation of

willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."

Here, Bausch claims that his testimony, and documents marked and admitted at the evidentiary hearing, establish that he was actively cooperating and providing information to SA Burkin. Bausch contends he was assured by SA Burkin that he would not be prosecuted and would receive immunity as long as he continued working with SA Burkin and provided good information. Bausch claims that the only written confirmation of any type of immunity was given to him in an email from SA Burkin in March 2011. However, he deleted the email from his password protected computer because he was concerned his roommate would learn he was cooperating with the FBI. Bausch claims that he printed a hard copy of what government counsel repeatedly referred to as his "get out of jail free" email, placed it in a folder and stored it in his garage. Bausch also testified that this March 2011 email and other hard copies of email communications with SA Burkin were lost when he was evicted from his home and the landlord would not allow him to retrieve his boxes of documents from the garage.

In *Wilson* the Ninth Circuit agreed that a defendant's "active cooperation could have provided the necessary acceptance and consideration had an offer of immunity in exchange for his cooperation ever been made." *Wilson*, 392 U.S. at 1060. However, the critical inquiry is whether a contract was formed because "no contract exists without an offer." *Id.* Once a defendant meets his burden of establishing the existence of an immunity agreement, the burden is on the government to show the defendant breached the immunity agreement. *United States v. Mark*, 795 F.3d 1102, 1105 (9th Cir. 2015).

It is clear that Bausch sent SA Burkin many emails between 2010 and 2014, which Bausch believes were leads or "hot leads" that would assist in the FBI's ongoing investigation of telemarketing scammers in the grant funding arena. It is also clear that Bausch believed his information was instrumental in causing FBI raids and criminal indictment. It is equally clear that SA Burkin and SA Killcommon did not regard Bausch's information as useful to their investigations because it was too general, non-specific, information they already had, or as SA Killcommon testified, "non-actionable."

23

The court finds that SA Burkin did not offer Bausch immunity.  The court found SA Burkin credible that he never offered Bausch immunity, although Bausch requested immunity on several occasions.  The court also found that Bausch was completely unbelievable in his testimony that SA Burkin promised immunity, told Bausch he got approval for immunity from his boss, an unidentified AUSA, and got an email in March 2011, confirming that his immunity was approved by the U.S. Attorney's Office.  The email exchanges between Bausch and SA Burkin establish that Bausch communicated with SA Burkin between October 2010, and January 4, 2015, after Bausch was arrested and indicted.  The email exchanges, however, simply do not support Bausch's claims that he was ever offered immunity.  To the contrary, the written evidence belies Bausch's claims.

The court will outline the following illustrative, rather than exhaustive, examples of the documents that refute Bausch's claim that he was offered immunity.  An FBI 302 memorializes an interview conducted by SA Burkin and SA Tierney on July 29, 2011.  It was marked and admitted as part of Defendant's Exhibit 1.  In the 302 Bausch stated he was "stoned" during his last meeting with SAs Burkin and Tierney.  Bausch also stated he would "kill himself" before going to jail, would "plead the Fifth" on everything, but was willing to provide assistance to investigators on other grant funding companies if he was provided a "letter of immunity."  This was 4 or months after Bausch claims SA Burkin sent him the email confirming immunity had been granted.

This is the same interview with SAs Burkin and Tierney that Bausch testified about at the evidentiary hearing.  According to Bausch's testimony, he came in to pick up tax records.  SA Burkin "handed him off" to Tierney who did not like Bausch.   Bausch testified Tierney questioned Bausch for three to five minutes about a telemarketing script, and then handed him a plea agreement from a state or local District Attorney's Office.  Bausch testified that Tierney acknowledged that SA Burkin had offered Bausch immunity, but stated that immunity could not be given to him and the plea agreement was the best deal Tierney could get for Bausch.  According to Bausch, this was a plea agreement from a state or local District Attorney's Office on a pre-printed tri-fold form with a place for the signature for the D.A.  The deal called for

24

Bausch to plead guilty, serve 24 months in prison, and pay $2 million in restitution.  SA Tierney testified that this never occurred, and as a federal agent he would not present a plea agreement on behalf of a state District Attorney.  The court finds Bausch's testimony that a plea deal was presented to him by SA Tierney on behalf of the District Attorney's Office preposterous.

The August 15, 2011 302 memorializes an interview of Bausch by SA Burkin.  Because Bausch had claimed that he had an attorney, SA Burkin explained that any future communications would need to be coordinated through his attorney.  Bausch responded that he had still not hired an attorney and was not represented, but would only get an attorney *after he was arrested* because he could not afford one otherwise.  The 302 documents that Bausch stated he was uncomfortable with the last meeting with agents because he was being accused of committing fraud that he did not do.  Bausch reiterated his willingness to work with the FBI and provide information. SA Burkin explained that any assistance "would need to be coordinated through an attorney" because Bausch's previous emails stated he was going to hire an attorney.  Bausch responded that he "will not accept any deal that would send him to jail and will only accept probation."   These statements are inconsistent with Bausch's claims that an immunity offer was confirmed in a March 2011 email Bausch deleted, printed and later lost.

Bausch testified that he met with SA Killcommon on October 30, 2011.  Prior to meeting with Killcommon, Bausch testified he met with SA Burkin who told Bausch not to mention their immunity deal.  Bausch's email and testimony indicate that he believed that SA Killcommon was a "confidential informant specialist."  However, SA Killcommon testified she had never been an informant specialist and does not even recognize the title.  After the October 30, 2013 meeting with SA Killcommon and Secret Service special agents, Bausch sent a series of emails to SA Burkin expressing his dissatisfaction with how the meeting went, and the fact that Killcommon told him point blank that Bausch had nothing to do with the indictments related to her investigation.  None of the November 1, 2013 emails Bausch sent SA Burkin refer to an immunity deal, although the first email that day does refer to a "handshake deal."  The court found SA Burkin credible when he testified he did not have a "handshake deal" with Bausch, and did not know what Bausch was talking about.

25

The court found SA Burkin credible that he did not respond to the majority of the emails Bausch sent him.  The court also believed SA Burkin when he testified that he began to develop serious questions about Bausch's mental stability and credibility.  The series of emails Bausch sent SA Burkin on November 1, 2013, beginning at 9:18 a.m. certainly support that view.  This was the day after Bausch met with SA Killcommon.  The email memorializes that Killcommon told Bausch he had nothing to do with the arrests involved in her investigation.  The email referred to a "handshake deal" between SA Burkin and Bausch.  The 9:18 a.m. email told SA Burkin that he could not sign a deal that barred him from the grant industry, but would sign anything else and would testify.  However, it goes on to say "but please don't send people with machine guns to my house cuz I work from home man.  No tanks or helicopters from this point anything you want or any meeting I will come down to FBI, OK.  Plus I keep no data on hardware anymore.  All of my new shit is in the cloud so if you raid my house you won't get any data . . . ."

The email contradicts any suggestion that Bausch believed he had immunity as late as November 1, 2013, because it asks for something in writing before he sends SA Burkin more information.  Specifically, Bausch stated he wanted full immunity for himself and a few others who had helped him.  He agreed to testify and to sign anything SA Burkin wanted about the companies he was involved in, which would be the complete truth.  The email concludes by suggesting Bausch could be an undercover officer placed in call centers the FBI wanted intel on because:

> I got tats
> im a rapper
> I blend in
> I am a closer
> plus I smoke weed everyday cuz I have an anal fissure I need it for the pain and I use it for my bi polar disorder.
>
> I would like a badge and a gun though!
>
> Hey let me know man you guys have a great day!

An email sent later in the day on November 1, 2013, suggested setting up a storefront telemarketing operation in which Bausch offered to go undercover.  Bausch asks the FBI to

provide him with a "Benz" so that he could look "like I'm balling with my grant business."  He told SA Burkin he could convince the individuals involved in grant scams to go into business with him and wanted the FBI to provide him with money, a Rolex, and earrings so that he could "look like I'm doing it in the grant biz" so that the proposed business would attract all scammers. He sent a follow up email to SA Burkin in which he said he would "like the license plate on the benz to say grantz."

A December 2, 2013 email to SA Burkin stated that Bausch was aware the grand jury was in session considering the Silver State funds case.  Bausch requested a meeting away from the FBI building with just SA Burkin.  In it Bausch also states, "I want you to know I'm sticking to my guns.  If I have to go to court I plan on fighting this out as long as it takes.  I never devised a plan to scheme or scam people."  This email clearly suggests Bausch believed he was about to be indicted and intended to fight the accusations in court, and denied that he was guilty of anything.

Bausch sent Burkin an email on January 4, 2015, after he was arrested and indicted which also belies any suggestion that SA Burkin offered Bausch immunity from prosecution.  The email states that Bausch was disappointed in how SA Burkin handled the arrest.  The email states that Bausch told SA Burkin "if you are ever going to arrest me just contact me and I would surrender myself to the FBI.  Now you guys broke the doors . . . I expected more respect after helping you catch all the scammers."  The email refers to the last time Bausch met with SA Burkin on Halloween 2013, regarding the Greg Villegas threat and complained that SA Burkin "pushed me off to Elizabeth Killcommon who was not informed that it was me who cracked the case."  The email concludes by stating "I was under the impression that from my assistance and cooperation in helping you guys catch all of the scammers I would not be charged."

Finally, the testimony of attorney Michael Van directly contradicts Bausch's testimony about an offer of immunity.  Mr. Van's testimony also contradicts SA Burkin on one point. After Bausch testified at the evidentiary hearing, the court recalled SA Burkin to ask if he recalled discussing Bausch with attorney Van.  SA Burkin told the court that he knew attorney Van and had worked with him on another case, but did not recall discussing Bausch with Van.

Mr. Van testified that Bausch came to him some time ago and said he was providing information and working with SA Burkin.  Mr. Van testified that he told Bausch he needed a proffer letter.  The word immunity was never discussed, and Bausch did not claim he had been offered immunity.  Both Van and SA Bausch testified that Van called SA Burkin while Bausch was in Van's office.  Bausch testified the conversation lasted approximately 40 minutes.  Mr. Van testified that the conversation lasted 2-3 minutes, dealt primarily with Van's other client, and that he discussed Bausch for 15-30 seconds of the conversation.  Van testified that he told SA Burkin that Bausch was in his office, would like to cooperate, and asked if SA Burkin was interested.  SA Burkin responded that it depended on the information that Bausch had.  Van characterized the conversation with SA Burkin as friendly and cordial, but stated Burkin very non-committal.  During the conversation, SA Burkin did not tell Van that he was promising anything and Van reiterated SA Burkin was "incredibly non-committal."

Additionally, Van testified that he discussed obtaining a proffer letter for Bausch if Bausch retained him.  His understanding of a proffer letter was an agreement with the government providing that if an individual cooperates and provides truthful information, the government may assist at sentencing at a later date.  Van testified he understood that a proffer letter was distinct from an offer of immunity, which was never mentioned.

Finally, it is clear from Bausch's testimony, and a number of documents marked and admitted in evidence at the evidentiary hearing, that Bausch was self-medicating during the period of time he claims he had an informal immunity agreement with SA Burkin.  In the light most favorable to Bausch, his perception and recollection were clouded by being "stoned" all the time.  Bausch testified he self-medicated by using marijuana for a physical condition and to treat his bipolar condition after he stopped taking his prescribed medications.  He had been diagnosed with bipolar disorder and hospitalized on two occasions in 2005, and 2009.  A 302 reflects that he reported being "stoned" on his first interview with FBI agents.  Bausch testified at the evidentiary hearing that in March 2011, when SA Burkin supposedly sent him the email confirming immunity had been approved by the AUSA, he was "stoned all of the time."  He also

testified that when SA Dickey called to ask why he had not come in to the office as promised he told Dickey he was playing video games and smoking dope.

In short, the testimony and documentary evidence simply do not support Bausch's claim that SA Burkin offered him immunity.  The testimony and exhibits do not objectively reflect words of offer.  The court found SA Burkin credible that he specifically told Bausch that SA Burkin did not have authority to offer immunity, that Bausch should consult with an attorney, and that charging decisions were made by the attorneys.  Applying objective contract standards, the court finds that an offer of immunity was never made.

For the reasons explained,

**IT IS RECOMMENDED** that Bausch's Motion to Dismiss (Dkt. #150) be **DENIED.**

DATED this 13th day of May, 2016.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE